**ARAWANA MILLS CO.**

v.

**UNITED TECHNOLOGIES CORP.**

**Civ. A. No. 5:91CV00711 (JAC).**

United States District Court,
D. Connecticut.

May 7, 1992.

Douglas A. Cohen, Peter M. Nolin, Franca L. DeRosa, Schatz & Schatz, Ribicoff & Kotkin, Stamford, Conn., Ira B. Grudberg, Steven D. Ecker, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, Conn., for plaintiff.

John B. Nolan, Scott P. Moser, Ann McClure, Day, Berry & Howard, Hartford, Conn., for defendant.

## RULING ON MOTION TO DISMISS

JOSÉ A. CABRANES, District Judge:

Pending before the court is defendant's Motion to Dismiss (filed Dec. 12, 1991), which was submitted for decision after oral argument on February 3, 1992.

### BACKGROUND

Plaintiff Arawana Mills Company ("Arawana") owns property on Newell Street in Southington, Connecticut ("the Property"), which is described in paragraph 5 of the Complaint (filed Oct. 21, 1991) ("Complaint"). Prior to 1963, it was undeveloped farmland. Since May of that year, defendant United Technologies Corporation ("UTC") has had sole and continuous possession of the Property pursuant to various lease agreements with plaintiff. Defendant's possession of the Property is currently based on a lease dated November 2, 1991 (the "Lease"). The Lease term expires on December 31, 1993. There appears to be no dispute over the validity or the terms of the Lease.

There is also no dispute that defendant overhauls and services jet engines on the Property, which involves the storage and handling of hazardous substances. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint (filed Dec. 20, 1991) ("Defendant's Memorandum") at 1–2 n. 1; Complaint ¶¶ 10, 11.

Plaintiff alleges that during its occupancy of the property, defendant has spilled, leaked and discharged hazardous sub-

stances into the soil and groundwater on the Property, Complaint ¶¶ 11–13, and that these activities have significantly contaminated its Property in violation of federal and state law. Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss the Complaint (filed Jan. 3, 1992) ("Plaintiff's Memorandum") at 3. Plaintiff contends that defendant's unlawful waste disposal practices and contamination of the Property have resulted in "ongoing actions" involving the State of Connecticut Department of Environmental Protection ("DEP") and the Environmental Protection Agency ("EPA").

First, plaintiff asserts that defendant filed a lagoon closure plan entitled Interim Status Partial Closure Plan (the "Plan") with the DEP pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.* ("RCRA") and applicable regulations. Complaint ¶ 14. The Plan has apparently not yet been approved by the DEP, but it contemplates, among other things, that the lagoon on the Property will be covered with an impervious layer and will contain a groundwater monitoring and containment system. Complaint ¶¶ 14–16.

Second, plaintiff contends that in 1990 the EPA instituted an action against defendant for the alleged violation of state and federal laws regarding the generation, treatment, storage and disposal of hazardous waste at eight of its facilities, including the Property. Complaint ¶ 18 (referring to

*United States v. United Technologies*, Civil Action No. H–90–715 (JAC), brought pursuant to RCRA, 42 U.S.C. § 6928(a)).[1]

Plaintiff does not contend that the federal government has initiated or requested an investigation or cleanup of the Property pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.*, or that the EPA has issued any notices to potentially responsible parties ("PRPs") for the cleanup of the Property under 42 U.S.C. § 9607.[2] Nor does plaintiff claim that the Property is listed on the National Priorities List ("NPL") of contaminated sites. 40 C.F.R. § 300, App. B (1991).

However, because of the alleged contamination of the Property and defendant's alleged failure to assure plaintiff that the Property will be completely cleaned up by December 31, 1993 (the date of the expiration of the Lease), plaintiff contends that it has begun to incur costs investigating, monitoring, assessing, evaluating and responding to the release and/or threat of release of hazardous substances on the Property, and that it will continue to incur costs necessary to clean up soil and groundwater contamination. Plaintiff's Memorandum at 6. Accordingly, plaintiff in this action seeks a declaratory judgment and reimbursement of response costs pursuant to CERCLA (First Count). The re-

---

1. All discovery and motion practice in *United States v. United Technologies*, Civil Action No. H–90–715 (JAC) (D.Conn.), were stayed on March 5, 1992 until August 1, 1992, upon consent of the parties. *See* Endorsement Order in that case on Joint Motion of the United States and Defendant United Technologies Corporation for a Stay of Discovery and Motion Practice Until August 1, 1992 (filed Mar. 3, 1992). The parties in that case expect to achieve a final agreement on all terms of settlement by lodging a signed consent decree by no later than August 1, 1992. *Id.*

2. Under CERCLA, four classes of persons may be held liable:
   (1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,
   (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substance for transport to disposal or treatment facilities or sites selected by such person.

42 U.S.C. § 9607(a). In some cases, the EPA notifies parties if they are one of the four classes of persons that might be a PRP for the cleanup of a particular site. *See In re Combustion Equipment Assoc., Inc.*, 838 F.2d 35, 36 (2d Cir.1988) (EPA notified a party that "it was a potentially responsible party (PRP) for the cleanup of ... sites under 42 U.S.C. § 9607").

maining eight counts of the Complaint are based on a variety of state common law and statutory theories: reimbursement of costs pursuant to Conn.Gen.Stat. § 22a–452 (Second Count); breach of contract (Third Count); specific performance (Fourth Count); waste (Fifth Count); nuisance and negligent nuisance (Sixth and Seventh Counts); strict liability in tort for engaging in abnormally dangerous activities (Eighth Count); and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a, *et seq.* (Ninth Count).

Defendant's motion seeks dismissal of the entire Complaint. Defendant argues that the First Count should be dismissed because no justiciable dispute exists between the parties as to CERCLA liability and plaintiff has alleged no reimbursable "response costs" as defined by CERCLA. Defendant contends that the remaining eight counts should be dismissed because (1) each of the state claims either "raises a novel or complex issue" or "substantially predominates" over the federal claims, such that the collection of state claims overwhelms even the most generous interpretation of the federal component of the action, *see* 28 U.S.C. § 1367(c)(1) & (2),[3] or because (2) none of the state law claims state a claim upon which relief can be granted.

## DISCUSSION

When considering a motion to dismiss the court accepts all factual allegations in the complaint as true and draws inferences from these allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Corcoran v.*

*American Plan Corp.,* 886 F.2d 16, 17 (2d Cir.1989). Dismissal is not warranted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Patton v. Dole,* 806 F.2d 24, 30 (2d Cir. 1986).

## I. *Response Costs*

The First Count of the Complaint is a CERCLA claim for response costs under 42 U.S.C. § 9607(a)(4)(B) ("section 9607(a)(4)(B)").[4] Defendant contends that plaintiff's claim for response costs must be dismissed because the allegations are not sufficiently particular and because there is no way to determine that such response costs are consistent with the National Consistency Plan, 40 C.F.R. Part 300 ("NCP"). Defendant's Memorandum at 21–25. For the reasons stated below, defendant's motion to dismiss the First Count on these grounds is denied.

### A.

In order to state a claim for response costs under section 9607(a),

> a plaintiff must allege that (1) the waste disposal site is a "facility" within the meaning of 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, *id.* § 9607(a)(4); and (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that are "consistent with the national contingency plan," *id.* §§ 9607(a)(4) & (a)(4)(B).

---

3. 28 U.S.C. § 1367(c) provides that a district court may decline to exercise supplemental jurisdiction over a state claim if—
   (1) the claim raises a novel or complex issue of State law,
   (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
   (3) the district court has dismissed all claims over which it has original jurisdiction, or
   (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

4. Section 9607(a)(4)(B) provides that
   > any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for.... any other necessary costs of response incurred by any other person consistent with the national contingency plan....

*Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152 (9th Cir.1989); *see also New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir.1985). In addition, the defendant must qualify as one of four categories of "covered persons" subject to CERCLA liability. *Id.; Ascon Properties,* 866 F.2d at 1152.[5]

■ The allegations of the Complaint state a claim under section 9607(a) upon which relief can be granted. First, plaintiff has alleged, and UTC does not dispute, that UTC "continues to be an 'operator' of the facility on the Property as defined by 42 U.S.C. § 9601(20)(A)." Complaint ¶ 26; Defendant's Memorandum at 12 n. 8. Therefore, plaintiff has properly alleged, and defendant does not dispute, that UTC is a "covered person" subject to CERCLA liability.

Second, plaintiff has alleged that "the Property was and is a 'facility', as defined by 42 U.S.C. § 9601(9), where hazardous substances have been and are deposited, stored, disposed of or placed or otherwise come to be located." Complaint ¶ 27. Indeed, defendant admits that "[b]ecause it handles and temporarily stores hazardous substances at the [Overhaul & Repair] facility, UTC would be deemed to be operating a 'facility' as defined by CERCLA." Defendant's Memorandum at 12 n. 8; *see also id.* at 1–2 n. 1 ("The [Overhaul & Repair] metal finishing operations, among others, involve the storage and handling of hazardous substances.").

Third, plaintiff alleges that "[d]uring UTC's occupancy of the Property, hazardous substances were released upon and under the Property, within the meaning of 42 U.S.C. [§] 9601(22)...." Complaint ¶ 28. Specifically, plaintiff claims that "hazardous substances were spilled, leaked, pumped, poured, emitted, emptied, discharged, injected, escaped, leached, dumped and/or disposed of upon the Property." *Id.*

Fourth, and finally, plaintiff alleges that "[a]s a result of the releases and the threat of further releases, Arawana has paid for action including, but not limited to, investi-gation, study, and assessment of the soil and groundwater contamination, which actions constitute a 'response' pursuant to 42 U.S.C. [§] 9601(23) through (25)." *Id.* ¶ 29. Investigation, study, and assessment of contamination constitute "response" costs within the meaning of CERCLA. *See Shore Realty,* 759 F.2d at 1042–43 (holding that "costs in assessing the conditions of the site ... squarely fall within CERCLA's definition of response costs"); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989) (holding that site investigation costs are response cost within the meaning of CERCLA); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1285–87 (D.Del.1987) (holding that monitoring and evaluation are response costs within the meaning of CERCLA even if no further response costs have been incurred), *aff'd,* 851 F.2d 643 (3rd Cir.1988). Plaintiff has also alleged that its "response is consistent with the [NCP], and therefore all response costs are compensable as 'necessary costs of response' pursuant to 42 U.S.C. [§] 9607(a)(4)(B)." *Id.* ¶ 30. Defendant acknowledges that plaintiff has claimed that it incurred some response costs and has claimed that the response costs are consistent with the NCP. *See* Defendant's Memorandum at 21.

### B.

■ Nevertheless, defendant contends that the claim for response costs must be dismissed because plaintiff's alleged response costs are not pleaded with sufficient particularity. Defendant's Memorandum at 22–24. I disagree. Plaintiff has given defendant fair notice of what its claim is and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. at 103. While plaintiff must allege that it incurred response costs, as it has done, "plaintiff 'need not particularize the costs' that it incurred." *Alloy Briquetting Corp. v. Niagara Vest, Inc.,* 756 F.Supp. 713, 717 (W.D.N.Y.1991), quoting *New York v. General Electric Co.,* 592 F.Supp. 291, 298

---

**5.** *See supra* note 2.

(N.D.N.Y.1984). Defendant relies upon *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39 (6th Cir.1988), for the proposition that plaintiff must identify the alleged response costs with greater specificity. Defendant's Memorandum at 22–23. The court in *McGregor* upheld the dismissal of a CERCLA claim for response costs because plaintiffs did not allege "that they had personally incurred response costs...." 856 F.2d at 43. The allegations in this case are distinguishable from those before the court in *McGregor*. In that case, the complaint alleged that plaintiffs, the EPA and the state environmental agency, had incurred response costs, and the court found that "plaintiffs failed completely to allege in their complaints either the costs they incurred or, at minimum, the actions they took in response to the allegedly hazardous conditions...." *McGregor*, 856 F.2d at 42. In this case, however, plaintiff has flatly alleged that it "personal-

ly" incurred response costs. Complaint ¶ 29–31. Moreover, plaintiff has specified that the costs incurred were for "action including, but not limited to, investigation, study, and assessment." *Id.* ¶ 29. Plaintiff has therefore alleged that it incurred response costs with sufficient specificity. *See Alloy Briquetting Corp.*, 756 F.Supp. at 717.[6]

## C.

■ Defendant also argues that the claim for response costs must be dismissed because "there is no way to determine at this time whether Arawana Mills' 'costs' are or ever could be considered to be consistent or inconsistent with the NCP." Defendant's Memorandum at 24. This is so, defendant claims, because "[a] determination of consistency could only be made in this case if a cleanup were in fact ever undertaken pursuant to CERCLA." *Id.* at 24. Defendant's argument is without mer-

---

6. Defendant's suggestion that plaintiff is required to allege the specific dates on which it incurred response costs in order to make out a *prima facie* case, Defendant's Memorandum at 23, is not supported by *Alloy Briquetting Corp.*, the case upon which it relies for that proposition. The court in that case explicitly found that "plaintiff has alleged that it incurred response costs with sufficient specificity to survive defendants' motion to dismiss." *Alloy Briquetting Corp.*, 756 F.Supp. at 717. Nonetheless, plaintiff in that case was required to amend the claim "to allege the dates on which it incurred response costs." *Id.* at 718. In so holding, the court specifically said that it was requiring such an amendment "in light of [the court's] holding ... regarding plaintiff's [claim] for a declaratory judgement." *Id.* at 717.

A review of the court's ruling in *Alloy Briquetting Corp.* dismissing part of plaintiff's claim for a declaratory judgment reveals that the court was *not* holding that plaintiffs must always allege specific dates on which response costs were incurred in order to state a claim for recovery of response costs. Plaintiff in that case sought a declaratory judgment "setting forth the liability of defendants under CERCLA for response costs that plaintiff has incurred or will incur." *Id.* at 719. Defendant sought to dismiss that part of the claim for "declaratory judgment regarding future costs...." *Id.* The distinction between past and future response costs was critical because of the peculiar circumstances of the case. Plaintiff leased the property which was the subject of the CERCLA claim from defendant. Due to plaintiff's failure to pay rent and taxes under

the lease, defendant obtained a warrant of eviction on May 8, 1990. However, plaintiff continued to occupy the property after May 8, 1990 by virtue of an order staying enforcement or execution of the warrant pending appeal. *Id.* The court recognized that plaintiff's occupation of the property pending appeal of the warrant of eviction gave plaintiff "an uncontested possessory interest" in the property, *id.* at 720, but it held that such an equitable interest in the property was "insufficient to confer standing to bring a CERCLA cost recovery action," *id.* at 721. For that reason, the court dismissed plaintiff's claim for "declaratory judgment with regard to future response costs." *Id.*

It is clear, therefore, that the court in *Alloy Briquetting Corp.* required the plaintiff there to amend the complaint to allege the specific dates on which response costs were incurred because plaintiff only had standing to assert a claim for recovery of response costs that were incurred *before* May 8, 1990, the date that a warrant of eviction issued after "possession" of the property had been awarded to the defendant. *Id.* at 719.

There is no reason to require plaintiff here to allege the specific dates upon which it incurred response costs because plaintiff has standing to assert a claim for all response costs, past, present and future. While defendant challenges the claim for a declaratory judgment on grounds of ripeness in this case, *see infra* Section II, it does not challenge plaintiff's standing to bring the claim for response costs, nor does it distinguish plaintiff's ability to recover past response costs from its ability to recover future response costs.

it. It is sufficient that plaintiff has alleged that the response costs were consistent with the NCP. The question of whether or not the alleged response in this case was consistent with the NCP is a factual one which can be resolved only at trial or after completion of full pretrial discovery. *See Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 695 (9th Cir. 1988) ("whether a response action is necessary and consistent with the criteria set forth in the contingency plan is a factual one"; defendants "will have ample opportunity at trial to express their concern that the costs incurred ... were unnecessary or inconsistent with the [NCP]"); *see also United States v. Mottolo*, 695 F.Supp. 615, 630 (D.N.H.1988) ("[w]hether ... response costs are inconsistent with the NCP is a triable issue of fact").

For the reasons stated above, defendant's motion to dismiss the claim for response costs is denied.

## II. *Declaratory Judgment*

In addition to pleading a CERCLA claim for response costs, plaintiff requests "[a] declaratory judgment that UTC is responsible for the existence of hazardous substances on the Property and liable for the clean up as well as any current and future cleanup costs on the Property under 42 U.S.C. Section 9607(a)(4)(B) and Section 9613(g)(2)." Complaint at 17, ¶ 1. Defendant contends that plaintiff's claim for a declaratory judgment must be dismissed because there is no cognizable legal dispute between the parties. Defendant's Memorandum at 9. In support of this argument, defendant argues that (1) there is no dispute between the parties, *id.* at 11–14; (2) the claim for a declaratory judgment under CERCLA is not ripe, *id.* at 15–18; and (3) the only relief obtainable under section 9607(a) is recovery of response costs, not declaratory judgment, *id.* at 18–21. For the reasons stated below, defendant's motion to dismiss the claim for a declaratory judgment on these grounds is denied.

A court may award declaratory relief only in "a case of actual controversy." 28 U.S.C. § 2201. "Basically, the question in

each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

### A.

■ Defendant argues that plaintiff may not seek a declaratory judgment because neither CERCLA nor the Lease "has to date given rise to adverse interests between the parties." *Id.* at 11. With regard to CERCLA, defendant contends that the interests of the parties are not adverse because "no government agency has demanded that either Arawana Mills or UTC initiate any cleanup of hazardous substances on the property or reimburse another party which had taken such action." *Id.* at 12. However, I join those courts that have "rejected the notion that a government order, ... or prior governmental approval, ... is a prerequisite to recovery in a private CERCLA suit." *Alloy Briquetting Corp.*, 756 F.Supp. at 719, citing *International Clinical Laboratories, Inc. v. Stevens*, 710 F.Supp. 466, 472 (E.D.N.Y.1989); *New York v. Exxon Corp.*, 633 F.Supp. 609, 617 (S.D.N.Y.1986); *see also Cadillac Fairview*, 840 F.2d at 696 ("The absence of a government enforcement action under CERCLA does not render the controversy between the party seeking declaratory relief and the party who owned the site at the time of hazardous waste disposal remote and hypothetical."). In each of those cases, as in this one, plaintiff sought a declaratory judgment as to liability under section 9607(a) of CERCLA. Accordingly, I must reject defendant's claim that there are no adverse interests between the parties under CERCLA simply because there has been no governmental order requiring action under CERCLA in this case.

Defendant also contends that there are no adverse interests between the parties "because there exists a binding, judicially

enforceable instrument establishing the relations of the parties with respect to the [P]roperty—the Lease." For this proposition, defendant relies upon *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.), *cert. denied* — U.S. ——, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991). In that case, our Court of Appeals held that there was a justiciable controversy in a securities fraud case where, in response to a complaint for a declaration of non-liability, defendant stated that it would not sue plaintiff. *Id.* at 562. In so holding, however, the Court of Appeals specifically noted that "[t]his is not a case where ... the defendant has 'entered into a binding, judicially enforceable agreement," in which case "the claims inarguably were moot." *Id.* at 563. Based upon this comment by the Court, defendant argues that *"Kidder Peabody* confirms that parties to enforceable agreements have established their legal relations and do not need, and are not entitled to, declaratory relief." Defendant's Memorandum at 14.

■ I cannot agree with defendant that the holding in *Kidder, Peabody & Co.* forecloses a claim for a declaratory judgment in this case. While it is true that the Lease requires UTC to operate its facility in compliance with "all applicable state and federal statutes" and to hold Arawana Mills harmless for all costs resulting from UTC's failure to do so, *see* Defendant's Memorandum at 13, it is simply not clear that in light of such provisions, plaintiff's claim for declaratory relief is "inarguably moot." The court in *Kidder, Peabody & Co.* was considering a securities claim and did not have before it a CERCLA dispute between two parties to a lease. It is clear that in this case there is a cognizable dispute between the two parties to the Lease regarding the responsibilities under CERCLA, and a declaratory judgment may be appropriate. *See Caldwell v. Gurley Refining Co.*, 755 F.2d 645, 647–48 (8th Cir.1985) (court affirmed a declaratory judgment in lessor's favor where lessor claimed that widespread pollution had occurred as a result of lessee's operations under the lease

and in violation of its terms and held that lessor was entitled to full indemnity from lessee for any claim or judgment paid for pollution occurring on the leased property); *compare* Complaint ¶ 41 (plaintiff claims that "UTC has breached and is currently breaching Section V of the Lease because it has contaminated the soil and groundwater on the Property in violation of various state and federal laws and regulations").

## B.

Defendant also contends that "a claim for a declaration as to potential future liability under CERCLA is not ripe." Defendant's Memorandum at 18. It is not ripe, according to defendant, because "there is no order requiring anyone to develop formal CERCLA removal or remediation plans and no such order is imminent." *Id.* at 17–18. However, the court has determined above that a government order or prior governmental approval is not a prerequisite to plaintiff's ability to recover in a private CERCLA suit. *See supra* Section II.A.; *see also Alloy Briquetting Corp.*, 756 F.Supp. at 719.

Defendant relies on *In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35 (2d Cir. 1988), to support its ripeness argument. That case, however, simply does not stand for the proposition that parties may not seek declaratory judgment in a private CERCLA action until after government approval or intervention.

The Court of Appeals in *In re Combustion* was faced with a party seeking a declaratory judgment that any CERCLA liability it "may" have was discharged by its bankruptcy. *Id.* at 37. The EPA had notified the party that it was a PRP[7] for the cleanup of two sites that were being investigated by the EPA, but the EPA had not filed any claims against the party. *Id.* at 36. In concluding that the matter was not ripe for judicial determination, the Court held that "under CERCLA, liability is not assessed until after the EPA has investigated a site, decided what remedial measures are necessary, and determined

7. *See supra* note 2.

which PRPs will bear the costs." *Id.* at 37. Two of the factors considered by the Court in determining whether the matter was fit for judicial decision were "(1) whether the agency action is 'final' and (2) whether the issue is purely legal or whether 'consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations.'" *Id.* at 38.

It is clear that the holding and discussion of the court in *In re Combustion* controls only those cases in which the EPA has engaged in enforcement action under CERCLA and one of the PRPs which the EPA has identified files a suit asking for a declaratory judgment that it is not liable. In such cases, the Court rightly observed, "[a]ccelerated judicial intervention creates the risk of burdening the courts and the litigants with disputes that were otherwise destined to disappear by themselves, a problem particularly acute when the burdened party is an agency of a coordinate branch of the government charged by Congress with administering a statutory program." *Id.* at 37. This is not such a case.

Here, the EPA is not engaged in enforcing any CERCLA regulations involving the Property, and accordingly, the EPA cannot be "burdened" by judicial intervention. Moreover, this is not a case in which the dispute is "otherwise destined to disappear by [itself]," because plaintiff has alleged that defendant is responsible for hazardous substances that have already been released on the Property. "A case is ripe where the essential facts establishing the right to declaratory relief have already occurred." *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 893 (9th Cir.1986), citing *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 242 (1937); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2757, at 585 (1983). Inasmuch as plaintiff has alleged that there was a release of hazardous substances on the Property during the time defendants operated the overhauling and servicing facility, plaintiff has alleged "the occurrence

of the essential facts establishing its right to a declaratory judgment." *Cadillac Fairview,* 840 F.2d at 696, citing *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d at 893.

### C.

▮ Defendant argues, in addition, that plaintiff may not obtain declaratory relief under section 9607 because "the only 'CERCLA claim' Arawana Mills could ever bring would be a claim for recovery of CERCLA 'response costs.'" Defendant's Memorandum at 20. This argument is not persuasive. Numerous courts have entertained claims for declaratory judgment as to liability for future response costs under section 9607 of CERCLA. *See, e.g., Cadillac Fairview,* 840 F.2d at 696; *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d at 893; *Alloy Briquetting Corp. v. Niagara Vest, Inc.,* 756 F.Supp. at 719; *New York v. Exxon Corp.,* 633 F.Supp. at 617; *International Clinical Laboratories, Inc. v. Stevens,* 710 F.Supp. at 472.[8]

For the reasons stated above, defendant's motion to dismiss the claim for a declaratory judgment is denied.

### III. *State Law Claims*

#### A.

▮ In addition to the CERCLA claim, plaintiff asserts various state law claims. The court's exercise of jurisdiction over the state law claims is governed by the Judicial Improvements Act of 1990, 28 U.S.C. § 1367(a) ("section 1367(a)"), which provides in relevant part that

the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve

---

**8.** Defendant is correct in asserting that plaintiff may not request injunctive relief under section 9607 of CERCLA. *See Shore Realty,* 759 F.2d at 1049; *Cadillac Fairview,* 840 F.2d at 697. Therefore, plaintiff may not base its request for an injunction on CERCLA, Complaint at 17 ¶ 2.

the joinder or intervention of additional parties.[9]

The court should exercise supplemental jurisdiction over the state law claims against defendant in this case because the state law claims and CERCLA claims clearly derive from a common nucleus of operative fact. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).[10] However, defendant contends that the court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) ("section 1367(c)").[11] Defendant relies upon section 1367(c)(1) and (2), arguing that the court should decline to exercise supplemental jurisdiction because the state law claims raise novel or complex issues of state law and substantially predominate over the federal claims. Defendant's Memorandum at 27–28. Defendant also suggests that the exercise of supplemental jurisdiction is disfavored, *id.* at 27, and that "the case law evinces a highly skeptical attitude toward attempts to append state claims to CERCLA actions," *id.; see also id.* at 30–35. I disagree.

■ Contrary to defendant's position, our Court of Appeals favors the exercise of pendent jurisdiction. *See Promisel v. First American Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir.1991) ("A federal court's exercise of pendent jurisdiction over plaintiff's state law claims, while not automatic, is a favored and normal course of action."), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Moreover, our Court of Appeals has specifically authorized the exercise of pendent jurisdiction over state law claims, including claims for common law and statutory nuisance, which were pendent to a CERCLA claim. *Shore Realty,* 759 F.2d at 1050 ("The public nuisance claim for abatement and the CERCLA claims clearly 'derive from a common nucleus of operative fact' and the State 'would ordinarily be expected to try them all in one judicial proceeding.' ").[12]

In addition, the state law claims in this case do not raise novel or complex issues of state law that would suggest, much less require, declining the exercise of supplemental jurisdiction pursuant to section 1367(c)(1). They include claims for such things as breach of contract, specific performance, strict liability and violations of CUTPA. It is enough to say that federal courts frequently exercise pendent jurisdiction over such common state law claims in cases grounded on serious federal claims. Although the hazardous waste claim under Conn.Gen.Stat. § 22a–452 arises under relatively new legislation, it does not appear to raise any novel or complex issues.

Finally, the state law claims in this case, which are meant to "supplement the CERCLA relief", *see* Plaintiff's Memorandum at 25, do not "substantially predominate" over the CERCLA claim so that I should decline to exercise pendent jurisdiction pursuant to section 1367(c)(2). Defendant's main concern seems to be that "the remedies sought under the state law theories vastly exceed those available under CERCLA." Defendant's Memorandum at 34; *see also id.* at 26–27. However, our Court of Appeals, in rejecting an argument that state law issues predominated over a CERCLA claim, ex-

**9.** The Judicial Improvements Act overruled the decision of the Supreme Court decision in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which rejected the so-called doctrine of "pendent party jurisdiction." The last sentence in section 1367(a) explicitly allows pendent party jurisdiction. Indeed, in enacting the Judicial Improvements Act, Congress stated that it "codifie[d] the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715 [86 S.Ct. 1130]." H.R.Rep. No. 734, 101st Cong., 2d Sess. 29 n. 15, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6802, 6875 n. 15.

**10.** *See id.*

**11.** *See supra* note 3.

**12.** Other courts have also authorized the exercise of jurisdiction over state law claims that were pendent to a CERCLA claim. *See, e.g., In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 835 n. 1 (3d Cir.1990) (court noted that district court exercised pendent jurisdiction over various state law claims which were pendent to CERCLA and Federal Employers' Liability Act, 45 U.S.C. § 51–60), *cert. denied,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991); *Cadillac Fairview,* 840 F.2d at 697 (9th Cir.1988) (reversal of district court's decision declining to exercise jurisdiction over state law claims pendent to CERCLA claims).

plicitly held that "it is irrelevant that the scope of relief under state law differs from that under federal law." *Shore Realty*, 759 F.2d at 1050.

For the reasons stated above, the court shall exercise supplemental jurisdiction over the state law claims in this case.

### B.

Since I have determined to exercise jurisdiction over the state law claims, I must address the merits of defendant's argument that each of the state law claims should be dismissed. *See* Defendant's Memorandum at 36–47. Defendant is presumably moving to dismiss each of the state law claims for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6).

### 1.

In the Second Count of the Complaint, plaintiff requests reimbursement of costs for the removal and mitigation of the effects of hazardous wastes and materials pursuant to Conn.Gen.Stat. § 22a–452 ("section 22a–452"). Section 22a–452(a) provides, in relevant part, that

> [a]ny person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of ... hazardous wastes ... shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal, or mitigation....

In short, defendant contends that this claim must be dismissed because plaintiff has not pleaded that it has incurred costs for "containment, removal or mitigation," as required by the statute. Defendant's Memorandum at 36–37. However, plaintiff has explicitly alleged that it has incurred "costs and expenses to contain, remove and otherwise mitigate the effects of hazardous waste and materials." Complaint ¶ 36. These allegations are sufficient to state a claim pursuant to section 22a–452 and, therefore, defendant's motion to dismiss this claim is denied. Defendant's suggestion that the particular costs and expenses incurred by plaintiff are not reimbursable

under section 22a–452, Defendant's Memorandum at 37, is clearly a question of fact for trial.

### 2.

Defendant contends that the Third, Fourth and Fifth Counts of the Complaint should each be dismissed as "premature." The Third Count of the Complaint is for breach of contract and is based upon Section V of the Lease. Plaintiff claims that "UTC has breached and is currently breaching Section V of the Lease because it has contaminated the soil and groundwater on the Property in violation of various state and federal laws and regulations." Complaint ¶ 41. Defendant argues that the claim should be dismissed because "Arawana Mills' right to make a claim for failure to correct any adverse conditions does not mature until the expiration of the Lease," Defendant's Memorandum at 38, and "Arawana Mills will only be damaged if UTC returns damaged property at the expiration of the Lease," *id.* at 39.

The Fourth Count of the Complaint is for specific performance and is based upon Section XII of the Lease. Plaintiff "seeks a decree of specific performance requiring Defendant to restore the Property to the same condition, relative to its freedom from contamination by hazardous substances, as when Defendant first assumed possession of the Property in 1963." Complaint ¶ 46. Defendant contends, however, that the claim should be dismissed as "premature" because "Arawana Mills' right to restoration of the property to its pre-lease condition only matures upon the expiration of the Lease on December 31, 1993." Defendant's Memorandum at 39.

In the Fifth Count of the Complaint, plaintiff claims that "[b]y virtue of its status as tenant, UTC was obligated not to commit waste on the Property," Complaint ¶ 48, and that "as a result of the contamination, [defendant] has committed and continues to commit waste on the Property," *id.* ¶ 49. Again, defendant contends that in order to state a claim for waste, plaintiff must show that the Lease has terminated. Defendant's Memorandum at 40–41.

Defendant moves to dismiss the Third, Fourth and Fifth Counts, therefore, simply because the Lease has not expired. The Third Count should not be dismissed on this basis because a landlord may sue for breach before a lease expires. *See, e.g., Danpar Assoc. v. Somersville Mills Sales Room, Inc.*, 182 Conn. 444, 438 A.2d 708 (1980) (landlord recovered expenses for cleaning, repainting and renovating damaged premises before lease expired). Neither should the claim for specific performance in the Fourth Count be dismissed. Defendant has set forth no authority for the proposition that a request for specific performance in the circumstances presented here is premature.[13] However, the Fifth Count, for waste, must be dismissed on the basis that the Lease has not expired, inasmuch as the Connecticut Supreme Court has specifically held that

> [i]n order to recover damages for waste, a claimant has the burden of "showing that the lease has terminated; showing with reasonable certainty the condition of the premises, or the portion of the premises complained of, at the inception of the term; showing the specific items of damage and the reasonable cost of repairing the items...."

*Gargano v. Heyman*, 203 Conn. 616, 623, 525 A.2d 1343, 1347 (1987), quoting 2 M. Friedman, *Leases* § 18.1 at 950 (2d ed. 1987).

For these reasons, defendant's motion to dismiss the Third and Fourth Counts is denied and the motion to dismiss the Fifth Count is granted. The Fifth Count shall be dismissed for failure to state a claim upon which relief can be granted.

### 3.

The Sixth and Seventh Counts of the Complaint are for nuisance. Defendant contends that plaintiff fails to state a claim upon which relief can be granted because "nuisance can only occur between legal strangers." Defendant's Memorandum at 41. For this proposition, defendant argues that "[n]uisance theory is not intended to benefit a landlord with regard to its property during the term of a lease." *Id.* at 42. However, defendant fails to draw to the attention of the court any authority to support its position.

In order to prevail on a claim for nuisance, plaintiff must simply prove that:

> (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was a proximate cause of the plaintiffs' injuries and damages.

*State v. Tippetts–Abbett–McCarthy–Stratton*, 204 Conn. 177, 183, 527 A.2d 688, 692 (1987). There is nothing in the relationship between a landlord and tenant that would appear to prevent a landlord from proving each one of these elements in a claim against a tenant, and, certainly, tenants can be held liable for injuries to third-parties caused by nuisance on leased property, *see id.*, citing *Perkins v. Weibel*, 132 Conn. 50, 52, 42 A.2d 360 (1945).

For the reasons stated, the motion to dismiss the Sixth and Seventh Counts of the Complaint is denied.

### 4.

The Eighth Count of the Complaint is for strict liability in tort for engaging in "abnormally dangerous activities." Complaint ¶ 63. Defendant argues that plaintiff fails to state a claim for strict liability because defendant's metal finishing activities on the Property do not constitute abnormally dangerous activities as construed under the law of Connecticut. Defendant's Memorandum at 43–44.

---

**13.** Although in this case plaintiff seeks to enforce a contract to *lease* land, it is notable that specific performance of a contract to *sell* land is clearly an appropriate remedy "which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light of the settled principles of equity." *Natural Harmony, Inc. v. Normand*, 211 Conn. 145, 149, 558 A.2d 231, 233 (1989); *see also Ecos Corp. v. Conlon*, 4 Conn.App. 572, 574, 495 A.2d 1111, 1112 (1985).

In order to sustain a claim for strict liability, plaintiff must prove that certain factors are present:

[1] an instrumentality capable of producing harm; [2] circumstances and conditions in its use which, irrespective of a lawful purpose or due care, involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous to the person or property of others; [3] and a causal relation between the activity and the injury for which damages are claimed.

*Caporale v. C.W. Blakeslee and Sons, Inc.*, 149 Conn. 79, 85, 175 A.2d 561, 564 (1961); *see also Levenstein v. Yale University*, 40 Conn.Supp. 123, 126, 482 A.2d 724, 726 (Conn.Super.Ct.1984). Defendant is disputing the presence of the second of these factors by contending that the challenged activity in this case, metal finishing, is not an abnormally dangerous activity.

■ The question of whether an activity is abnormally dangerous is a question of law for a court to decide. *Caporale*, 149 Conn. at 86; *Green v. Ensign–Bickford Co.*, 25 Conn.App. 479, 485, 595 A.2d 1383, 1387, *appeal denied*, 220 Conn. 919, 597 A.2d 341 (1991). Connecticut has traditionally limited the imposition of strict liability in tort to those property owners engaged in such ultrahazardous activities as blasting and pile driving. *See Whitman Hotel Corp. v. Elliott & Watrous Engineering Co.*, 137 Conn. 562, 565, 79 A.2d 591, 593 (1951) (blasting); *Caporale*, 149 Conn. at 85–86 (pile driving); *Green v. Ensign–Bickford Co.*, 25 Conn.App. at 482–83 (experimental explosions).

■ I decline to extend strict liability to an activity such as metal finishing, which does not involve such things as "flying debris resulting from [an] explosion" or "damage caused by concussion or vibration." *Green v. Ensign–Bickford Co.*, 25 Conn.App. at 483. Plaintiff contends, however, that "[t]he acts forming the basis of plaintiff's claim for ultrahazardous activity are not 'metal finishing' but its storage, use and contamination of the premises by hazardous waste." Plaintiff's Memorandum at 31. To support such allegations,

plaintiff relies upon *Southern New England Telephone Co. v. Clifford*, 5 C.T.L.R. 331 (Conn.Super.Ct. Dec. 10, 1991), which upheld a claim for strict liability for storage of gasoline in an underground tank where plaintiff alleged that leaking gasoline had resulted in the pollution of grounds. To the extent that the court in *Southern New England Telephone Co. v. Clifford* intended to hold, as plaintiff seems to suggest, that the storage and use of hazardous material is necessarily a basis for strict liability, I respectfully disagree. *See generally Commissioner v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967) (federal courts are not bound by decisions of state courts other than the highest court of the state); *Calvin Klein Ltd. v. Tylon Trucking Corp.*, 892 F.2d 191, 195 (2d Cir.1989) ("Absent a rule of decision formulated by the [state's highest court], we are not bound by the opinions issued by the state's lower courts."). At least two other courts, including this court, have rejected the notion that the storage and use of hazardous materials, which result in a subsequent release, constitutes an abnormally dangerous activity for which strict liability should be imposed. *See The Stop and Shop Companies, Inc. v. Amerata Hess Corp.*, H–84–454 (MJB), 11 Conn.L.Trib. No. 11, at 1 (D.Conn. Oct. 16, 1984) (Blumenfeld, J.) (where gasoline leaking from underground storage tanks had contaminated subsoil and groundwater on property, no cause of action for strict liability because gasoline storage is not abnormally dangerous or ultrahazardous); *William Burns, Comm'r of Transp. v. Lehigh, Inc.*, 1988 C.S.C.R. 722 (Conn.Super.Ct. July 12, 1988) ("leakage of gasoline into the subsurface soil is insufficient to state a cause of action for strict liability").

■ It does not appear that the Connecticut Supreme Court has addressed the issue of whether the storage and use of hazardous waste is a basis for strict liability. In the absence of any direct decision by the state's highest court, a federal court must determine what it believes the state's highest court would find if the same issue

were before it. *See Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves, et al.,* 929 F.2d 103, 105 (2d Cir. 1991); *Plummer v. Lederle Laboratories, Div. of American Cyanamid Co.,* 819 F.2d 349, 355 (2d Cir.), *cert. denied,* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). I am persuaded that if given the opportunity to expand the narrowly-construed concept of "ultrahazardous" or "abnormally dangerous" activity to the storage and use of hazardous wastes, the Connecticut Supreme Court would decline to do so. Such activities are subject to extensive federal and state regulation, *see, e.g.,* CERCLA, 42 U.S.C. § 9601 *et seq.;* Conn.Gen.Stat. § 22a–452, and I do not believe that the Connecticut Supreme Court would interpose an expanding common law into such matters by imposing strict liability in every case in which a plaintiff can prove that a defendant stored and used hazardous waste. Accordingly, I conclude that the storage and use of hazardous waste is not *per se* an "ultrahazardous" or "abnormally dangerous" activity for the purpose of imposing strict liability. I conclude further that plaintiff has failed to state a claim for strict liability in this case inasmuch as it has failed to allege any facts showing that the "circumstances and conditions" of the activity conducted by defendant on the Property "involve a risk of probable injury to such a degree that the activity fairly can be said to be intrinsically dangerous." *Caporale,* 149 Conn. at 85, 175 A.2d 561.

For the reasons stated, defendant's motion to dismiss the claim for strict liability in the Eighth Count of the Complaint is granted. The Eighth Count shall be dismissed for failure to state a claim upon which relief can be granted.

**5.**

The Ninth Count of the Complaint is a claim for violation of CUTPA. CUTPA provides, in relevant part, that

[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

Conn.Gen.Stat. § 42–110b(a). The conduct plaintiff complains of is defendant's "activities as lessee on the Property and in leasing said premises." Complaint ¶ 65. Defendant argues that plaintiff has failed to state a claim under CUTPA because "UTC is not in the trade of leasing property; it is in the trade of repairing aircraft engines. Therefore, UTC cannot be liable for a CUTPA violation in its manner of leasing property." Defendant's Memorandum at 47. The question before the court, therefore, is whether defendant's act of leasing the Property from plaintiff is in the conduct of defendant's "trade or commerce" within the meaning of CUTPA. *See Colonial Motors, Inc. v. The New York Design Group, Inc.,* Civil No. H–86–206 (AHN), slip op. at 3 (D.Conn. June 20, 1986) ("plaintiff must 'at least allege and establish that the challenged unfair or deceptive act occurred in the conduct of defendant's 'trade or commerce' ").

A "trade or commerce" is defined in CUTPA as "the advertising, the sale or rent or *lease,* the offering for sale or rent or lease, or the distribution of any services, and *any property* ... and any other article, commodity or thing of value in this state." Conn.Gen.Stat. § 42–110a(4) (emphasis added). By its terms, therefore, CUTPA can apply to those who "lease" property.[14] However, the narrower question presented here is whether leasing property is defendant's "trade or com-

---

**14.** Both lessors and lessees can be said to "lease" property. For instance, plaintiff "leases" the property to defendant, and defendant "leases" the property from plaintiff. *See* Black's Law Dictionary 812 (5th ed. 1979) (a lessor is "[o]ne who rents property to another" and a lessee is "[o]ne who rents property from another"). However, it may be that CUTPA is only meant to cover the practices of lessors, such as plaintiff, rather than lessees, such as defendant. CUTPA is more likely aimed at the activities of lessors, since "CUTPA was designed to protect the public from unfair practices" of, for instance, landlords, *Daddona v. Liberty Mobile Home Sales, Inc.,* 209 Conn. 243, 257, 550 A.2d 1061 (1988), and in light of the fact that one of the factors to consider in determining if a violation of CUTPA has occurred is "whether it causes substantial injury to consumers," *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984), citing *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972). It is fair to say that lessees are usually members of the "public" and "consum-

merce." *See Colonial Motors*, slip op. at 3–4 ("critical question before the court is whether CUTPA encompasses a lessee-customer who leases one automobile for use in its office design business and then converts the automobile to its own use").

Certainly, defendant's act of leasing property from plaintiff is incidental to the conduct of its true business on the Property, the repair and servicing of aircraft engines. Indeed, plaintiff has not alleged facts to establish that defendant is in the "trade or commerce" of leasing property, but has alleged that defendant is in the "trade or commerce" of repairing and servicing aircraft engines. *See* Complaint ¶ 10 (plaintiff alleges that UTC uses the Property "for the repair of aircraft engines and parts, manufacturing, offices, warehouse and storage").[15] Accordingly, plaintiff lessor has no claim under CUTPA against defendant lessee for defendant's conduct in leasing the Property, because leasing property is not this defendant's "trade or commerce" within the meaning of CUTPA. *See Colonial Motors*, slip op. at 5 ("leasing of one automobile by a customer who is not involved in the trade or business of leasing automobiles, does not constitute 'conduct of any trade or commerce' ").

For the reasons stated, the motion to dismiss the CUTPA claim in the Ninth Count of the Complaint is granted. The Ninth Count shall be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons stated herein, the Motion to Dismiss (filed Dec. 12, 1991) (Doc. # 15) is GRANTED in part and DENIED in part. The Fifth, Eighth and Ninth Counts of the Complaint are hereby DISMISSED.

It is so ordered.

---

ers" that CUTPA is meant to *protect*, rather than to *regulate*.

**15.** Plaintiff contends that leasing is a "necessary part of UTC's business of overhauling and ser-

vicing jet engines." Plaintiff's Memorandum at 33. Such a contention is obviously wrong inasmuch as UTC might choose to own, rather than lease, the property on which it conducts its business.